Good morning, your honors. My name is David Kula and I'm here this morning from the beautiful, gorgeous city of Asheville, North Carolina to argue on behalf of the plaintiff, Appalachian Stanley Jeffrey Penley. This is, of course, an appeal from the district court order of August 19, 2016, granting summary judgment on behalf of all defendants dismissing plaintiff's constitutional First Amendment retaliation claim, conspiracy claim, and related pendent state claims. Quite simply, everything the district court could have done to violate the standards for granting summary judgment established by the Supreme Court in the Toland case, and by this very circuit's decisions in Jacobs and Geschus, the court did, committing multiple reversible errors. And actually, with the time allotted, I don't know that I can even address them seriatim. I'm going to have to go by category rather than by each of the errors committed by the court. Primarily, right off the bat, the district court, again, this would be in violation of everything Toland had to say, Jacobs had to say, and Geschus had to say, the district court failed to acknowledge plaintiff's evidence and arguments before it. 800 pages, 800 pages of evidence cited to the district court in our briefs below, not one, not one reference or citation by the district court to any of that. And notably, almost all of that evidence was uncontradicted, uncontroverted. It was established in large part by testimony out of the defendant's own mouths. Also, arguments. The whole question of causation here. Pardon me? So what do you do about the whole question of causation? I didn't hear that. What did we do? Well, I'll spell out my question. Sure. The political activity in which this individual engaged in opposition to Mr. Gillespie for the North Carolina House. Yes. The last political activity, as I understand it, was in 2008? Yes. Okay. And the suspension did not occur until 2013. Correct. So five years, a lapse of five years between the act that you say gave rise to the suspension and the actual suspension, that's quite a period of time. If I may, I'm sorry, but also in addition to the lapsing of that five-year period of time, you also have to factor in that the same defendants awarded, I believe as I understand the facts, appellant tenure in the interim in 2010. So you have the last activity in 2008, tenure in 2010-11, and then the retaliation in 2013. Well, to your point, Your Honor. Then, in addition to what my colleague has pointed out, the comments that were questionable occurred on April 17th and April 18th, and the suspension occurred on April 22nd. So it would seem that those, to put it mildly, inappropriate comments would have precipitated the suspension, rather than the political activity five years before. If I may, Your Honor, addressing your comments first, Your Honor, that's an inaccurate read of the record, because there was no evidence whatsoever that anybody on the board or administration knew either of plaintiff's political activities or of the six-year predatory campaign by Mr. Gillespie to get the plaintiff fired. So, yes, the plaintiff was granted tenure, but the defendant... So my statement isn't inaccurate. You started out by saying that the statement was inaccurate, and I just pointed out that he was awarded tenure. Right. And that's true? That's true. But there was nobody at that time... I'm trying to ascertain what I said that you found inaccurate. Okay. The defendant, the primary defendant protagonist, Dr. Martine, the superintendent, wasn't on board then. Her agreement with Gillespie reached in 2012 to go after the plaintiff was after his grant of tenure. But what agreement to go after the plaintiff? What is your evidence that they had an agreement to go after the plaintiff? It's circumstantial, Your Honor, and it begins on the first day of school of the 2012 school term when the defendant, Mitch Gillespie, by all accounts the most powerful politician in McDowell County, an eight-term House of Representatives individual, is touring the high school campus with Dr. Martine. This is the first day of school. And he says that's the one I was telling you about. Well, not only that's the one I was telling you about, but this fact I'm going to give you now is out of Mr. Gillespie's own mouth and is not mentioned at all by the district court. Mr. Gillespie is walking down the hall with Dr. Martine and says, I am not going in to Jeff Penley's classroom because of his political opposition to me. Minutes later, they come up to the doorway of Mr. Penley's classroom, and loud enough for Mr. Penley to hear and all the students to hear, he says to her, that's the one I've been telling you about. Takes her by the arm and leads her out of the classroom and they move on. Minutes later, after leaving Dr. Martine, he goes into the principal's office, Ben Talbert. Now, he's already regaled Ben Talbert for years about how much he doesn't like Mr. Penley and how he wants him fired. So on the first day of school, after telling Dr. Martine, I'm not going into his classroom because of his political activity. That's the one I've been telling you about. He again goes into Mr. Talbert's office, telling Mr. Talbert again, I don't like this guy, in which Mr. Talbert is taking it as another effort on the part of Gillespie to get Penley fired. Now, what evidence do we have of an agreement between Martine and Gillespie is pages and pages and pages of arguments before the district court, which they did not even address in our brief document number 90, in opposition to the superintendent's motion for summary judgment, pages 5 through 17. There is an intense briefing of the cases and the factual evidence about circumstances. If all of this was true, why did they wait five years to take action? I mean, I just haven't seen something. Because Mr. Gillespie could not find a willing henchman. His entreaty to Dr. Martine in her first year of the group. Or because it was only five years later when, I mean, your client did give them good reason to terminate him. More than one good reason. Well, no, you can't. I don't think you can say that's inaccurate, because even Penley himself acknowledged that some official reaction to his behavior was appropriate. And, in fact, he tried to talk the young woman who was upset in his classroom and whose mother contacted the principal. He tried to talk her out of going to the principal. No, that's not accurate. Well, I'm sorry, Your Honor. What you're recounting are findings of fact, inappropriate findings of fact by the district court. What's an inappropriate finding of fact? When you don't like? No, because it's contested. It's seriously and vigorously contested by the plaintiff below. For the district court to find that's what it found, and you're accurate about what the court said. The district court found that Penley chased down the student and tried to get her to stop the report. That's not what Mr. Penley testified to. That's not how he explained what he was doing. When he explained what he was doing, and, by the way, the student in her own notes does not quote Mr. Penley as saying that. There is no quotation in her own notes given to the principal that Mr. Penley tried to stop her from reporting it. You are saying that it is inaccurate that Penley apologized to the student and attempted to dissuade her from reporting the incident to the principal. Is that your position? Yes. He apologized. Look, he apologized to her in the classroom when the comment was made. The comment was made without her name, and he said, Jolene. But she was the only one sitting next to her boyfriend. Right. Well, he said, Jolene, that was not directed at you. I'm sorry if you think it was. Well, I think it was. How could she not think it was? Dr. Martine herself, Your Honor, said that without the names, the comment is not disciplinable. Well, look, this man is supposed to be teaching a class in government. It's an AP class in government. Now, what in the world did the comment about how often men think about sex or man-boy love associations or whatever, what does that have to do with what he's supposed to be teaching, which is an AP government class? How do those comments get in an advanced placement government class? And, you know, of course the parents would complain about something like that. And the school system, which is supposed to be responsive to some degree to parents and students, would have been remiss if it hadn't looked into it. And you can say, well, that was, you know, in bad faith or there was a conspiracy or what have you. But Mount Healthy says, when you examine the whole question of causation, is there a matter of did the school system proceed in good faith? And it's hard to see on the heels of a parental complaint a comment that has nothing to do with the subject matter that is supposedly being taught and is not only, you know, far afield from the subject matter, but is personally embarrassing and indeed mortifying to two of the students seated right before him in class. Why wouldn't the school system look into it and take some disciplinary action? And in Mount Healthy says, as long as they're moving in good faith, that's enough. And of course they're moving in good faith here. How could they just sit there and do nothing and let the complaints pile up and the comments go on? I mean, they have to look into it. It's their duty. First of all, Your Honor, they did have the right to investigate. But they didn't investigate. And the finding by the district court that evidence determines that the administration acted in good faith is totally unfounded by anything in the record. All of the evidence in the record, which we briefed extensively, especially in our reply brief, gives you all like the superintendent lying to the plaintiff's face and concocting a charge that she knew was false. The superintendent fabricating charges against the plaintiff, which were not supported by any policies. The superintendent's violation of her own board policies in failing to investigate certain of her charges. The fact that the principal falsified and lied in her interview responses after interviewing students, none of that was mentioned by the district court, none of it. What the district court did then was indulge in an impermissible finding of fact that the administration acted in good faith, ignoring reams and embarrassment of riches of evidence to the contrary. Now, the comments that Mr. Penley made, no evidence that they were made with the names. Here's the best case scenario for the defendants. Even with their interview on April 24th of 26 students who were there that day, only two of the 26 said that the plaintiff used the female student's name. The rest of them that talked about the male student's name being used, those were the results that were fabricated by Defendant Gouge. But how did this have to do with the course of instruction? The comment, the second- How did the comment relate to the subject of the political science or the structure of government or wherever the AP class was supposed to be? I mean, how does something like that get thrown into the discussion? As explained by the plaintiff, Your Honor, that comment was in response to a comment made by a student that was calling into question Defendant Gouge's qualifications as principal at the high school. She said to Mr. Penley, this was student-originated. He was trying to extract himself from this. Mr. Penley, Ms. Gouge doesn't know what boys are like regarding sex here. She was an elementary principal. It's kind of a shame here because here we're having all of this money spent on this litigation and all of this time, everyone's time and everything, all of which really might have been productively devoted to educating somebody and to the primary business of the schools. And we asked the federal courts to intervene in something that really ideally ought to be resolved by the people closest to the situation in the school system themselves, the principal, the superintendent, the school board, perhaps even the state courts. And we just invade so casually the ability of school systems to resolve their problems internally, which they often do a pretty good job of doing, even though some people dislike other people and some people don't like others, and that's human nature. But we are, you know, carried sufficiently far. We're making ourselves into school principals and we're making ourselves into school superintendents and we're just, you know, ignoring the responsibilities that those closest to the ground, which is the students and the parents and the teachers and the principals and the superintendents and the school boards, they just get right out of the picture because the federal courts are going to decide to tell them how to manage the whole thing. And, you know, this suit carries us so far from the devotion of energies to education. It's really a shame. Thank you, Your Honor. My time is up. No, not quite. Okay. With respect to the district court's incorrect findings of fact, I would like to refer you to Mr. Pinley's own testimony on pages 384 through 396, with particular attention to 390 and 395, in which he talks about his attempts to converse with Jolene and also what he believes. No, while you're in preparation for rebuttal, you might just want to be aware of that. Okay. Thank you. You have some rebuttal. Yes. Good morning. May it please the Court. Good morning, Your Honor. My name is Robert King. I'm here from the Brooks Pierce Law Firm in Greensboro. It is my honor to be here. It's a real treat to come up and argue in front of the Fourth Circuit. I represent the Appellee's McDowell County Board of Education, Natalie Gouge, who is the principal at the school, and Russell Neighbors. I'm joined at council table by my friend Ann Patton Hornthal, who represents Dr. Martine. In 2015, Jeff Pinley, the appellant in this case, had a conspiracy in his head that I think he really believed. And that conspiracy was, in his own words, that every Republican leader in McDowell County, and if you know McDowell County, that means every leader in McDowell County, including Mitch Gillespie, were out to get him, as was Russell Neighbors, a longstanding respected member of the bar, as were two well-respected career educators, Dr. Martine and Ms. Gouge. He believed that these people were so intent on getting him, years after his political activity, that they would risk their careers, their livelihoods, their reputations, and their monies in order to ruin his career. Maybe we should stick with undisputed facts. Are those undisputed facts? They don't sound like it. Well, those are facts as to the allegations, and I will skip to more of the essence of the matter, Your Honor. Well, for my purposes, it would be helpful. I would be happy to do that, Your Honor. In filing this lawsuit, Mr. Pinley was given the tools that are offered in the rules of civil procedure to get all the documents he wanted, to take every deposition he wanted, to look at people's computers, and he was given that opportunity. He got all the discovery he wanted, and when defendants, appellees here, move for summary judgment, as one court said, it was time to put up or shut up. It was time to go to Judge Cogburn and say, Judge, when I filed this lawsuit, I said that there was a conspiracy, and if you gave me the opportunity to find the evidence, I would find the evidence, and here's the evidence that I brought to you. Now, Mr. Pinley had three things that he had to present evidence of to the court. He had to show animus, an unlawful intent. He had to show action, the suspension, and he had to show a causal connection between the two, and he got two of those. He showed evidence of unlawful animus in that he said, Mitch Gillespie said years ago that he was going to get me. The whole thing is straightforward. The case found on the point of causation. That's exactly right, Your Honor. That's the core of it, so why don't you hone in on that? I will do that, Your Honor, and on the causation issue, when the time came for summary judgment, what the plaintiff appellant brought to the court as evidence of causation was nothing, and we have quoted extensively from his deposition because I went through and said, do you have evidence that there was a causal connection, in essence, between the animus and the action, and his answer time after time was, I do not have any evidence. I have suspicions. Now, it seems to be undisputed there's no direct evidence, so what the appellant has said is, I don't need direct evidence. I've got circumstantial evidence, and I've got circumstantial evidence of two forms. First, he argues temporal proximity. That is that the time gap between the animus and the action was so short that a jury would logically conclude that the animus was a substantial factor in the action. The problem is, as the Supreme Court said, if you don't have direct evidence and you're relying on circumstantial evidence of temporal proximity, the time period between the animus and the action has to be, in the words of the Supreme Court, very close. In the Clark decision, the Supreme Court said that a period of 20 months between the animus and the action was too long, and in that decision they cited decisions from appellate courts that gaps of four months and three months were too long. Now, Your Honor mentioned that there was a five-year gap. In the nub of the case, to just sort of clear away some brush, is that there was a five-year lapse between the last political activity and the discharge. As Judge Duncan points out, in the interim he was granted tenure. That seems to be undisputed. And the time period between the inappropriate comments and the suspension and the investigation was, in contrast to the time period between the political activity, amazingly short. What we were dealing with is the difference between a matter of days that April and a matter of years with respect to Plaintiff's case. It's days versus years. You're exactly right, Your Honor, and one thing that I would say is it was not five years, because the issue is the gap between when the animus was created. That was 2004. That's when he started making Mitch Gillespie mad. That's when he started his political activities, and the animus was created, and the activity or the adverse action, which was 2013, is actually a nine-year period. And I don't know of any case that says nine years or six years or three years or two years is sufficient, and the Supreme Court has said that 20 months is too long. Now, there's a response from the appellant, and it's a creative argument. They point to the price decision, and they say in the price decision, the court looked at first opportunity. Well, the price case was a failure to hire situation, and looking at the first opportunity makes sense there, because if the plaintiff doesn't work for the defendant. It is a simple point of human nature. If you have it in for someone, you don't wait five years to take it out on someone. You are exactly right, Your Honor. Or nine years. I don't know which. And the plaintiff had every opportunity to find evidence of this conspiracy, and he came up with absolutely nothing. That's why he's latched on to this temporal proximity argument that is a degree of magnitude longer than any period that a Fourth Circuit court has ever said is sufficient to get over this hurdle. The other piece of circumstantial evidence that the plaintiff points to is he says, look, there was no basis for this disciplinary proceeding, and that's simply untrue, and that is undisputed that it is untrue. When this occurred, Mr. Penley admits that he made inappropriate statements of a sexual nature to a minor female student in front of her peers. Now, it's fine if Mr. Penley wants to say he didn't do that, except during the investigation, Mr. Penley had a meeting with Dr. Martine that was recorded and transcribed and is part of the record, and here is Mr. Penley's words. I feel sorry for this young lady. I said something I shouldn't have said. I was the one who caused this. I feel horrible. At lunchtime, I saw her boyfriend, and I apologized to him. I said I crossed the line. So here we have Mr. Penley saying Ms. Gouge and Dr. Martine lied, in their words, and made everything up, and yet we have him on tape admitting that he engaged in misconduct. The point is the school system and the school principal got word of the comments. There was a protest from the parents who apparently the young girl went back and was mortified by what was said in class. They have to look into that. I mean, it's just a school system doesn't have a choice to let something like that just float along. They've got to get to the bottom of it. They've got to understand whether there are more such comments. They've got to understand exactly what was done and what was said. They don't have any choice but to be responsive to the students and parents and other constituent groups in the public school community. Your Honor, they have a legal obligation and they have a moral obligation to protect the children in their charge. From Your Honor's comments during my colleague's statement, it reminded me of what Judge Cogburn said during our summary judgment hearing. Somebody has got to be the adult in the room, and the teacher is supposed to be the adult in the room. Well, and didn't Mr. Penley admit as much during his deposition that the student had a right to complain? His answer, yes. And then the school needed to investigate. His answer, yes. Had an obligation to investigate. That would include interviewing students. That would include interviewing students. And to Judge Wilkinson's comments when my colleague was speaking, this is not the super Supreme Court, I mean super Board of Education. The Board of Education has responsibilities and there is a system and process to deal with this. And, in fact, Mr. Penley took advantage of that process and had the opportunity for a hearing and was not dismissed and was only suspended. But the court does not sit as a super Board of Education or a super personnel committee. Well, the problem is when we do, we just drain all kinds of time and all kinds of resources and everything from the school system. And I just keep thinking sometimes when I see these internal squabbles between teachers and principals and the rest, that how far this takes us from devoting our resources to educating young kids. It just takes us so far off the field and it results in a transfer and reallocation of responsibilities that our federal system was never designed for. It would be shocking, I think, to the architects of our Constitution who actually drafted a Tenth Amendment and gave the state some residual power to know that federal courts were involving themselves to this degree in a teacher-principal squabble in the county public school. This stuff is advanced by degrees to the point that it's really just educationally and constitutionally unfortunate. As my grandmother would say, you're preaching to the choir, Your Honor. I agree. I would be happy to answer any questions that the court may have. I would simply add two points on the pendant claims, on the malicious prosecution, one of the things that the plaintiff had to present. Well, the civil conspiracy claim. I guess you can't even talk to anybody about disciplinary action without being part of a conspiracy. I think that's exactly right, Your Honor. Again, I'd be happy to answer any questions, but aside from that, then I would— Let's see if we have any questions. No. We would simply ask that the decision of the lower court be affirmed. Thank you, Your Honors.  Certainly. I want to reemphasize that on the temporal proximity issue, the time runs from when Dr. Martin was aware of his activities. So it's an eight-month— Mr. Carrillo, I'm sorry, but this does trouble me. Yes. You said that the district court did not accurately find facts. Yes. I was pointing out that Mr. Penley had acknowledged that some response, some official response to his behavior was warranted. Just an investigation, yes. No. You took issue with, I said, official response, and also that he spoke with the young woman, Jolene. So on page 386, Mr. Penley, in his deposition, testifies to not only talking to Jolene after class with her walking away, but also following her later to try to bring it up again with the goal. He says yes. Okay. With the goal of dissuading her from going to the principal. So that is not a misfound fact. That is Mr. Penley's own statement. And also, it was his own statement that he thought that under the circumstances, an investigation including interviewing students. So we do read the record. Well, to that point, Your Honor, it's still an impermissible finding of fact by the district court, as we explained in detail in multiple pages in our reply brief. That comment by Mr.— Mr. Kula, there's no response to that. Well, I'm— I'm sorry, there's just no response to that. This is Mr. Penley's—these are his own words. That was cut out of context in the defendant's brief. It was his response to specific questions. All right. If I could just clarify it. Elsewhere, cited in our brief, he said, I never intended to keep her from reporting this. He explained in detail that there's a protocol, teacher's protocol, that you discuss with students before they go up the chain, so to speak, to see if it can be resolved at the teacher's level. In this case, he said, I wanted to talk to Jolene. She was angry about something. Her response was over the top. I did need to talk to her before she went on, and I wanted to get this resolved. Not with the goal of attempting to keep her from going to see the principal. He said that. Not with the goal of keeping her from making the report. There's two different parts of that testament. I'm sorry. Okay. I don't want to take up any more of your time. That's fine. Thank you, Your Honor. I appreciate that. In terms of rebuttal, the defendants conveniently, as the district court did, just slip over reams of evidence about the conspiracy and causation. For example, the board member's statements to Mr. Penley on the courthouse lawn in September of 2013, that, quote, we know that Dr. Martin's charges are garbage. They're a result of both Gillespie and neighbors being the driving force behind your termination. And all of the circumstantial evidence cited in our brief, Your Honors, concerning the evidence of pretext. We've cited five different courts of appeals decisions about these indicators are evidence of pretext. And all of that evidence considered in terms of the bulk of the facts undisputed that we've briefed, in terms of the law, showing that pretext has been established, showing that the motive of the pretext, the reason for these charges, are not the proper and real reasons. The other thing at work here is that the defendants have been arguing now, before the district court in here, about three charges that the superintendent brought. She brought in the notice of charges and litigated at the hearing 22 different charges against the plaintiff. They have just treated the other 19 charges as if they don't exist. Under a Mount Healthy analysis, that's absolutely fatal to any Mount Healthy argument on their part. The superintendent herself said at the administrative hearing and in her deposition, that all of the charges were necessary to terminate the plaintiff. Not just one, not just two, or not just three. All of the charges. She said repeatedly, I relied on everything in the notice of charges to fire the plaintiff. Well, if everything in the notice of charges to file the plaintiff includes her falsified charges, her baseless charges that she knew were false when she crafted them, how then can she legitimately claim good faith in terms of a Mount Healthy defense? 22 charges to three charges, the court below it never has addressed our arguments regarding the illegality of that. The defendants have never addressed it. Even here today, we've gone through nine briefs, two different levels of court, and the defendants have never once cited any authority or any reason on how they can redact, redraw the narrative, and totally rewrite the superintendent's case against the plaintiff. I'm sorry. Thank you, sir. Thank you, your honors. I really appreciate your hearing and your consideration. We will come down to the council and take a brief recess.
judges: J. Harvie Wilkinson III, Allyson K. Duncan, Stephanie D. Thacker